J-S72010-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| MICHAEL C. GOLD, | |
| Appellant | No. 826 EDA 2016 |

Appeal from the Judgment of Sentence Entered October 1, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0010118-2014

BEFORE:  BENDER, P.J.E., MUSMANNO, J., and STEVENS, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:            **FILED FEBRUARY 22, 2018**

Appellant, Michael C. Gold, appeals from the judgment of sentence of

an aggregate term of 10 to 20 years' imprisonment, followed by 5 years'

probation, imposed after a jury convicted him of aggravated assault and

several related offenses.  We affirm.

The trial court summarized the procedural history and factual

background of this case as follows:

> After a jury trial, commencing on July 29, 2015, [Appellant] was
> found guilty on July 31, 2015[,] on charges of aggravated
> assault[, 18 Pa.C.S. § 2702(a)], carrying a firearm without a
> license[, 18 Pa.C.S. § 6106], carrying a firearm on a public street
> or property[, 18 Pa.C.S. § 6108], and possession of an instrument
> of crime[, 18 Pa.C.S. § 907].  On October 1, 2015, [Appellant]
> was sentenced to an aggregate imprisonment term of ten (10) to
> twenty (20) years, followed by five (5) years['] probation.
> Thereafter, he filed a post-sentence motion, which was denied on

---

* Former Justice specially assigned to the Superior Court.

February 10, 2016. On February 29, 2016, he filed a notice of appeal. This court ordered [Appellant] to file a statement of matters complained of on appeal on March 1, 2016. He filed his statement on March 21, 2016.

## STATEMENT OF FACTS

On July 21, 2014, [Appellant] approached Warren Wallace on the 1700 block of South 59th Street and shot him once in his left leg. Mr. Wallace had been inside his home before the shooting when he received a phone call from Cianna Davis, his then girlfriend, who informed him that she was about to fight someone outside her home. Mr. Wallace attempted to persuade her against it, but she went outside to join in a fight involving three (3) to four (4) other females. As a result, Mr. Wallace left his residence at 5912 Springfield Avenue and followed Ms. Davis about one-half block to the corner of 59th and Belmar Streets. He was about thirty (30) feet behind Cianna Davis when the fight began at the corner. There were about twenty (20) to thirty (30) people standing around the scene.

Warren Wallace saw a man, later identified as [Appellant], come from behind a car, approach Cianna Davis, and punch her in the back of her neck. Mr. Wallace ran up the street toward [Appellant] and tried to punch him in the face. However, before Mr. Wallace landed a punch, [Appellant] struck him, and the two men began to fight with each other. During this brawl, an unnamed female hit Mr. Wallace in the face. As he turned to address this woman, [Appellant] pulled out a silver and black revolver from his right pants pocket and shot Mr. Wallace in the leg. After the shooting, [Appellant] fled the scene, running toward Windsor Street.

At 1:11 p.m., Police Officer Ethan Houser responded to a radio call about this shooting. When he arrived on scene, he saw the victim near a tan vehicle and called for rescue. At about 1:18 p.m., Fire Department Paramedic Kevin Roberts arrived on the 1700 block of South 59th Street, where he found Mr. Wallace suffering a gunshot wound to his left thigh and an open femur fracture. Paramedic Roberts stabilized the victim and transported him to the Hospital of the University of Pennsylvania at 34th and Spruce Streets, where he underwent surgery. The surgeon did not remove the bullet, but a steel [rod was] placed inside his leg. After his release from the hospital, Mr. Wallace engaged in physical therapy three (3) hours per day, three (3) times a week, for six (6) months. He walked on crutches for four (4) months.

At trial, Mr. Wallace stated that he still feels pain and walks with a limp.

Detective Craig Fife from the Special Investigations Unit was assigned to investigate this shooting. He went to the crime scene and recovered a purple head scarf from the middle of the street and a can of mace from the curb. He also found a Pennsylvania state identification card for Antoinette M. Rhodes on the 1700 block of South 59th Street. This item was returned to Ms. Rhodes on August 11, 2014. No ballistics evidence was found on the crime scene, which was secured, sketched and photographed.

At 2:41 p.m., Detective Fife interviewed Warren Wallace at the hospital. He provided a signed statement wherein he described the shooter. On the next day, July 22, 2014, at 4:25 p.m., Detective Robert Conway showed Mr. Wallace a photographic array. He recognized one male from the photographic array and stated that the man was on the scene during the fight. Mr. Wallace also provided Detective Conway with a description of the shooter during this interview. About one week later, Mr. Wallace was shown another photographic array in black and white. He did not identify any one [*sic*] at that time. On August 5, 2014, at 1:53 p.m., Detective Fife showed Mr. Wallace the same photographic array in color. This photographic array included photographs of the same individuals who were previously shown to him in the black and white photographic array. After being shown the color photographic array, Mr. Wallace identified [Appellant] as the shooter.

At trial, the victim explained why he was unable to identify the shooter in the black and white photographic array. He stated: "Because it's in black and white. Everybody look the same for real for real." He further explained that no one stood out to him in the black and white photographic array, but that he quickly identified [Appellant] when he viewed the color photographs.

On July 21, 2014, at 2:30 p.m., Detective Michael Kimmel went to the Sing Gong Chinese Restaurant at the corner of 59th and Belmar Streets and recovered surveillance videotape from eight (8) cameras in and around the property. He discovered that the time listed on the videotape was one (1) hour, seven (7) minutes and eleven (11) seconds slow. From this recovered surveillance videotape, Detective Kert Wilson prepared a compilation videotape that was three (3) minutes and twenty-one (21) seconds in length. The videotape displayed [Appellant's] crossing

the street on the crosswalk toward the Chinese restaurant. The videotape then showed [Appellant's] entering the Chinese store and subsequently leaving with his purchase. The videotape is time stamped at 12:00:04 p.m. However, the actual time is about 1:07 p.m.

During the course of this investigation, Detective Fife reviewed the compilation videotape. At trial, Detective Fife stated that he had made significant observations while viewing the videotape. As [Appellant] turned his body toward the counter inside the Chinese restaurant, an object appeared to be underneath the right side of [Appellant's] shirt. [Appellant] appeared to be adjusting his pants, particularly on the right side.

At trial, the Commonwealth introduced a self-authenticating certification of non-licensure that provided [Appellant] did not have a valid license to carry firearms under Section 6106 of the Uniform Firearms Act.

Trial Court Opinion (TCO), 12/15/2016, at 1-4 (internal citations omitted).

As mentioned *supra*, Appellant filed a timely notice of appeal, and a timely, court-ordered Pa.R.A.P. 1925(b) statement of errors complained of on appeal. Thereafter, the trial court issued an opinion pursuant to Rule 1925(a).

Presently, Appellant raises the following issues for our review:

Was the verdict against the weight of the evidence where the only eyewitness described an assailant who did not match [Appellant's] appearance, the witness failed to identify [Appellant] in an initial photographic lineup and no forensic evidence placed [Appellant] at the scene of the shooting?

Did the Commonwealth taint the verdict by repeatedly making improper references to [Appellant's] post-arrest silence and by suggesting that [Appellant] chose not to speak to the police because he was colluding with his family about an alibi?

Was the sentence an abuse of discretion where it radically departed upward from the very top of the aggravated range without adequate explanation?

Appellant's Brief at 7.

- 4 -

First, Appellant claims the verdict was against the weight of the evidence. Specifically, he complains that Mr. Wallace's description of the assailant did not match Appellant's appearance, Mr. Wallace failed to identify Appellant in an initial photographic lineup, and no forensic evidence placed Appellant at the scene of the shooting. *See* Appellant's Brief at 19.

We apply the following standard of review:

> An allegation that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. The Pennsylvania Supreme Court has explained that appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. To grant a new trial on the basis that the verdict is against the weight of the evidence, this Court has explained that the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court.

*Commonwealth v. Childs*, 63 A.3d 323, 326-27 (Pa. 2013) (citation and internal brackets mitted).

Here, the verdict did not shock the conscience of the trial court, which denied Appellant's weight claim. We discern no abuse of discretion in that decision. As the Commonwealth aptly explains:

> [Appellant's] brief continues to attack the victim's identification of him as unreliable on the basis that Mr. Wallace described the shooter as wearing a red t-shirt, whereas the surveillance video from the "Chinese store" shortly before the shooting reflected that [Appellant] was wearing what appeared to be a light-colored t-shirt. But this continues to ignore that the jury heard the same evidence [Appellant] now cites, and thereafter considered the defense['s] summation making the same arguments that he presents now. The … jury ultimately gave more weight to the considerations highlighted by the Commonwealth, including: (1) Mr. Wallace's accurate description of [Appellant] after the shooting as a black male with a close-cropped hairstyle and a scraggly beard; (2) the victim's highly confident identification of

- 5 -

him from the color photograph; (3) [Appellant's] presence in the nearby "Chinese store" minutes before the shooting, as confirmed by the video surveillance footage; (4) Mr. Wallace's description of the shooter as right-handed, which corresponded to the bulge on [Appellant's] right side as recorded in the video; (5) the victim's correct description of the gun as a revolver, which comported with the lack of any fired cartridge casings at the scene; (6) Mr. Wallace's recollection that the shooter left the area heading [in] the direction of 5839 Windsor Street, where [Appellant's] mother lived; and (7) the additional corroboration of the details of the victim's description of the shooting, such as its "girl fight" context that was substantiated by the recovery of a head scarf, identification card, and can of mace from the area. The jurors were entitled to credit Mr. Wallace's account overall despite concluding, for example, that he mistook the color of [Appellant's] shirt when still in great pain from the shooting.

Commonwealth's Brief at 9-10 (internal citations omitted). We agree with the Commonwealth's observations, and find no abuse of discretion in the trial court's rejection of Appellant's weight claim.

Second, Appellant claims that "the Commonwealth tainted the verdict by repeatedly making improper references to [Appellant's] post-arrest silence and by suggesting that [Appellant] chose not to speak to the police because he was colluding with his family about an alibi." Appellant's Brief at 23 (unnecessary emphasis and capitalization omitted). In particular, Appellant avers that "[t]he prosecutor introduced a recording of a telephone conversation between [Appellant] and his mother that occurred while [Appellant] was in custody following his arrest on the underlying charges in this case." *Id.* at 24. The following exchange occurred during the telephone conversation, which we produce verbatim:

[Appellant]: Where my mom at?

[Appellant's fiancé]: Right here.

[Appellant]: Put her on the phone?

[Appellant's fiancé]: Hold on.

[Appellant's mother]: Hello?

[Appellant]: Yeah, how you feelin' – you alright?

[Appellant's mother]: Yeah, I'm good. I ain't shit, I'm good.

[Appellant]: I am sorry. I'm … I'm … I'm sorry Ma, you hear me? I ain't mean to do nothin' like that, but I just … like, it was my instinct. You know what I'm sayin?

[Appellant's mother]: I know. I know. You ain't say nothin.

[Appellant]: Naw.

[Appellant's mother]: You ain't say nothin, right?

[Appellant]: Fuck no.

[Appellant's mother]: Alright, we cool. Cool.

[Appellant]: We good. I know we good, Mom. But like I said, I don't want this shit to get fucked up. You see what I'm sayin?

Commonwealth's Exhibit 25 (referred to herein as the "8/9/2014 prison tape"). Appellant asserts that "[t]his exchange constitutes nothing but evidence that [he] did not speak to the police[,]" and "the evidence was admitted only to suggest that [Appellant] somehow had something to hide by his silence." *See* Appellant's Brief at 25.

We deem this claim waived. It does not appear to us, nor does Appellant indicate, that he lodged any timely and specific objections when the allegedly improper references occurred during trial. *See Commonwealth v. Duffy*, 832 A.2d 1132, 1136 (Pa. Super. 2003) ("In order to preserve an issue for review, a party must make a timely and specific objection. Also, an appellant may not raise a new theory for an objection made at trial on his appeal.")

(citations omitted).[1]  In fact, Appellant's post-arrest right to remain silent appears to have been raised for the first time during the charging conference.[2] However, at that time, Appellant actually declined the court's offer to instruct the jury that no adverse inference could be drawn from his post-arrest silence:

> [Appellant's counsel]: Judge, if I may, I appreciate the opportunity to speak to my client.  One of the things that we had spoken about was a curative instruction, but I did not talk to my client about that, so I wanted to bring that around regarding the post-arrest silence.
>
> I've spoken to him, he does not want a curative charge to the jury with you instructing them that they can't take an adverse inference to that.
>
> …
>
> [The court]: [W]ith respect to the proposed curative instruction, I think we should be clear, the record should be clear what we're talking about.  There was a reference, albeit brief, in the 8/9/[20]14 prison tape that says, and I'm reading from the transcript,
>
>> [Appellant's mother]: You ain't say nothing?
>>
>> [Appellant]: Naw.
>>
>> [Appellant's mother:] You ain't say nothing, right?
>>
>> [Appellant]: Fuck no.
>>
>> [Appellant's mother:] All right.  We cool.

---

[1] We additionally note that Appellant only objected to the admission of the telephone conversations on the basis that he "was prejudiced by late disclosure, that the recordings included only excerpts and could be misleading, that the statements were not directly inculpatory and therefore not relevant, and that they unfairly showed [Appellant] was in custody."  Appellant's Brief at 9 (citation omitted).

[2] Appellant acknowledges that the trial court raised this issue *sua sponte.*  **See** Appellant's Brief at 13.

As I told the attorneys at sidebar, that could be construed by someone looking at this down the road as a reference or comment of [Appellant's] post-arrest right of silence.

I took the liberty of looking at the cases. There's one on point, [**Commonwealth v. Pearson**, 685 A.2d 551 (Pa. Super. 1996)], and it says that under circumstances such as this where there is potentially that concern, a curative instruction would be appropriate.

***So I brought that to the attention of counsel at sidebar and [Appellant's counsel] told us, albeit off the record, that he did not believe it was appropriate, his client and [Appellant's] mother made clear that they were talking about something other than an alleged confession, as [the Commonwealth] characterizes it an admission, that they were talking about an apology and obviously they were not talking about his invocation of his right to silence.***

***My position was that I would give the instruction despite all of that and [Appellant's counsel] sought leave to discuss it with his client and you're now telling me that you do not want that instruction; is that right?***

[Appellant's counsel]: ***That's correct, Your Honor.***

[The court]: Now, you are still under oath, [Appellant]. You heard the entire exchange; is that right?

[Appellant]: Yes.

[The court]: And you know precisely what we're talking about; agreed?

[Appellant]: Yes.

[The court]: ***And you do not want me to give a curative instruction; is that right?***

[Appellant]: ***Yes.***

N.T. Trial, 7/30/2015, at 195-99 (emphasis added).

In addition to not timely and specifically objecting to the Commonwealth's references, Appellant actually declined the trial court's

curative instruction in order to instead argue that the conversation was not related to an 'alleged confession' or Appellant's 'invocation of his right to silence.' Accordingly, we find this claim waived.[3]

Finally, Appellant argues that "the trial court abused its discretion in imposing a sentence that radically departed upward from the top of the aggravated sentencing range without adequate explanation." Appellant's Brief at 27. This issue constitutes a challenge to the discretionary aspects of his sentence.

It is well-established that,

> [t]here is no absolute right to appeal the discretionary aspects of sentencing. To properly preserve the discretionary aspects of sentencing for appellate review, the issue must be raised during sentencing or in a timely post-sentence motion. If properly preserved, the applicable procedures and standards governing our review are as follows:
>
> > Two requirements must be met before a challenge to the discretionary aspects of a sentence will be heard on the merits. First, the appellant must set forth in his brief a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of his sentence. Pa.R.A.P. 2119(f). Second, he must show that there is a substantial question that the sentence imposed is not appropriate under the Sentencing Code. 42 Pa.C.S.[] § 9781(b). The determination of whether a particular issue raises a substantial question is to be evaluated on a case-

---

[3] We also acknowledge that, in his Rule 1925(b) statement, Appellant only contended that the Commonwealth implicated his right to remain silent in its opening statement, not repeatedly throughout the trial. *See* Pa.R.A.P. 1925(b), 3/21/2016, at 3. Moreover, with respect to the Commonwealth's opening statement, Appellant only made a general objection, did not seek a curative instruction, mistrial, or other relief, and failed to mention anything related to his right to post-arrest silence. *See* N.T. Trial, 7/29/2015, at 52-53.

- 10 -

by-case basis. In order to establish a substantial question, the appellant must show actions by the sentencing court inconsistent with the Sentencing Code or contrary to the fundamental norms underlying the sentencing process.

*Commonwealth v. Sheller*, 961 A.2d 187, 189-90 (Pa. Super. 2008) (some citations omitted).

Here, Appellant preserved this issue in the trial court and included a Pa.R.A.P. 2119(f) statement in his brief. *See* Appellant's Supplemental Motion for Post Trial Relief, 10/13/2015, at 2-3; Appellant's Brief at 5-6. Further, "[w]here the appellant asserts that the trial court failed to state sufficiently its reasons for imposing sentence outside the sentencing guidelines, we will conclude that the appellant has stated a substantial question for our review." *Commonwealth v. Rodda*, 723 A.2d 212, 214 (Pa. Super. 1999) (citation omitted). Accordingly, we determine that Appellant has stated a substantial question.

We apply the following standard of review for claims challenging a discretionary aspect of sentencing:

> Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. In this context, an abuse of discretion is not shown merely by an error in judgment. Rather, the appellant must establish, by reference to the record, that the sentencing court ignored or misapplied the law, exercised its judgment for reasons of partiality, prejudice, bias or ill will, or arrived at a manifestly unreasonable decision.
>
> When imposing a sentence, the sentencing court is required to consider the sentence ranges set forth in the Sentencing Guidelines, but it not bound by the Sentencing Guidelines. The court may deviate from the recommended guidelines; they are merely one factor among many that the court must consider in

- 11 -

imposing a sentence. A court may depart from the guidelines if necessary, to fashion a sentence which takes into account the protection of the public, the rehabilitative needs of the defendant, and the gravity of the particular offense as it relates to the impact on the life of the victim and the community. When a court chooses to depart from the guidelines however, it must demonstrate on the record, as a proper starting point, his awareness of the sentencing guidelines. Further, the court must provide a contemporaneous written statement of the reason or reasons for the deviation from the guidelines.

When reviewing a sentence outside of the guideline range, the essential question is whether the sentence imposed was reasonable. An appellate court must vacate and remand a case where it finds that the sentencing court sentenced outside the sentencing guidelines and the sentence is unreasonable. In making a reasonableness determination, a court should consider four factors:

> (1) The nature and circumstances of the offense and the history and characteristics of the defendant.

> (2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation.

> (3) The findings upon which the sentence was based.

> (4) The guidelines promulgated by the commission.

A sentence may be found unreasonable if it fails to properly account for these four statutory factors. A sentence may also be found unreasonable if the sentence was imposed without express or implicit consideration by the sentencing court of the general standards applicable to sentencing. These general standards mandate that a sentencing court impose a sentence consistent with the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant.

*Sheller*, 961 A.2d at 190-91 (internal citations and quotation marks omitted).

Appellant essentially advances a two-part argument as to why the trial court abused its discretion in imposing his sentence. First, he claims that "the

trial court's sentence was an abuse of discretion because it effectively applied an improper sentencing range[.]" Appellant's Brief at 27. He explains:

> The standard range for the aggravated assault charge was 60 to 78 months in prison, plus or minus 12 months. The top of the aggravated range was 90 months in prison.[4] Nevertheless, the prosecutor attempted to argue for a sentencing range topping out at 120 months in prison, based on the application of a prior record score founded on an unproven juvenile adjudication.
>
> And while it appears that the trial court correctly refused to adopt that range, it nevertheless considered the adjudication and acted as though the range should have been calculated the way the prosecutor hoped. The ten-year sentence that was imposed was the same sentence that would have represented the top of the aggravated range had the prior record been included. The actual sentencing range, meanwhile recommended a maximum term of 90 months, which the trial court exceeded by two and one half-years. This strongly suggests that the trial court actually applied the higher range, despite paying lip service to the appropriate range.

Appellant's Brief at 28 (citation to record omitted).

We disagree. The trial court specifically stated that it would not apply the guidelines that included a juvenile adjudication for which the Commonwealth did not have certified documents to support. *See* N.T. Sentencing, 10/1/2015, at 14 ("I will disallow the enhanced guidelines and proceed with the ones that are articulated in the actual report."). Further, it provided the following reasons for deviating from the guidelines:

> I have the duty of imposing an appropriate sentence in this case. In doing so, I must take into consideration your need for

---

[4] At sentencing, without including Appellant's contested juvenile adjudication, the Commonwealth calculated the range for the aggravated assault charge to be 66 to 84 months, plus or minus 12 months. N.T. Sentencing, 10/1/2015, at 8. Appellant did not take issue with that computation. *Id.*

- 13 -

rehabilitation as well as society's need for protection, among other factors, all of which I have considered.

As I told you previously, I read the presentence investigative report and the mental health evaluation. The latter makes clear that you have no psychosis. The former documents say "history of violence."[5]

I take into consideration the fact that you are a father of three, albeit I must voice some concern that there is precious little evidence of an employment history.

You should know, and I tell you now, that I considered all the factors I'm required to as imposed on me by the legislature and our appellate courts, and I have given due consideration to the guidelines in this case.

I am troubled that under the circumstances as presented during the course of this trial that a gun was produced when even given the propensity of guns in our city, there was, by any reasonable standard, absolutely no need to engage in gun play.

At the very most, in the light most favorable to you, perhaps a fistfight.

What troubles me even more is the background, what took place before this shooting.

I see with great regularity adults gathering around in public watching two or more women fight. There is little effort by men or women, for that matter, to break up the fight or summon[] the authorities if you feel breaking it up will put you in danger. …

In this case, unfortunately, it escalated to gun play. There were other people there. Not only was the complainant shot and suffered serious bodily injury as a result there of [*sic*], other people were potentially put in danger.

_____

[5] Appellant seems to suggest that he has no history of violence. ***See*** Appellant's Brief at 28-29. Notwithstanding the disputed juvenile adjudication, Appellant was also convicted of reckless endangerment in Delaware. ***See*** N.T. Sentencing, 10/1/2015, at 20. Moreover, shortly after being released from custody for that offense, Appellant was convicted of carrying a firearm in the course of committing a felony in Delaware. ***Id.*** at 20-21.

...

> Your case, but for the grace of God, is not a homicide. You can shoot someone in the leg and hit a major blood vessel and they bleed to death and you would have been looking at third degree murder at a minimum, perhaps first degree murder.

N.T. Sentencing, 10/1/2015, at 24-27.

The trial court's statement demonstrates that it considered factors such as the circumstances of the offense, Appellant's history, the presentence investigation, and the guidelines, along with the protection of the public, the rehabilitative needs of Appellant, and the shooting's effects on the life of the victim and the community . *See Sheller*, 961 A.2d at 190-91. Therefore, we find no abuse of discretion by the trial court on this basis.

Second, even if Appellant committed a serious and violent crime, he maintains that the trial court should not have imposed a more significant sentence as a result because "the sentencing guidelines already account for that conduct." Appellant's Brief at 29. He explains that "[t]he lead guideline range was for aggravated assault, which is inherently a violent crime, and incorporates a separate gun enhancement for precisely this type of offense." *Id.* He points out that "[e]ven if the facts of the case warranted an aggravated sentence, and even one at the top of the range, that would only yield a sentence of 90 months." *Id.*

We reject this argument. This Court has previously established that "[e]ven if a sentencing court relies on a factor that should have not been considered, there is no abuse of discretion when the sentencing court has significant other support for its departure from the sentencing guidelines."

***Sheller***, 961 A.2d at 192. In the case at bar, the trial court observed that Appellant did not have to participate in the street fight, his gun use was wholly unnecessary, other people were present at the time of the shooting and potentially put in danger, and that this case easily could have been a homicide. ***See*** N.T. Sentencing, 10/1/2015, at 24-27. Thus, the trial court likewise did not abuse its discretion on this basis.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/22/18